**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**DORSEY & WHITNEY LLP**
Eric Lopez Schnabel
Alessandra Glorioso
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801
Telephone: (302) 425-7171
Email: schnabel.eric@dorsey.com
          glorioso.alessandra@dorsey.com

-and-

**SHIPMAN & GOODWIN LLP**
Eric S. Goldstein
Jaime A. Welsh
One Constitution Plaza
Hartford, CT 06103-1919
Telephone: (860) 251-5000
Facsimile: (860) 251-5218
Email: egoldstein@goodwin.com
          jwelsh@goodwin.com

*Counsel for Change Healthcare Operations, LLC*

| | |
|---|---|
| In re: | Chapter 7 |
| AYYAZ AHMED, AYSHA KHAN, PRESTIGE INFUSIONS, LLC, | Case No. 23-21777 (SLM) |
| LUSH FLORAL AND EVENTS, LLC, GOLDEN HEALTHCARE LLC d/b/a | (Substantively Consolidated) |
| GOLDEN HEALTHCARE PHARMACY, OAK HILLS MEDICAL BUILDING | Hon. Stacey L. Meisel |
| PHARMACY, INC. a/k/a OAK HILLS PHARMACY, INC., and DELTONA | Hearing Date: March 24, 2026 |
| MEDICAL ARTS PHARMACY, INC. d/b/a APEX HEALTH RX, | Hearing Time: 10:00 a.m. |
| Debtors. | |

**MOTION OF CHANGE HEALTHCARE OPERATIONS, LLC
TO DEEM TIMELY ITS LATE-FILED PROOF OF CLAIM**

Change Healthcare Operations, LLC, on behalf of itself and its parents, affiliates, successors, and assigns (collectively, "Change Healthcare"), hereby moves for entry of an order pursuant to Rule 3002(c)(7) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") deeming timely its late-filed proof of claim.

Between April and September 2024, Change Healthcare loaned $490,700.00 to Prestige Infusions LLC ("Prestige").  In December 2024, after the original bar date to submit claims, this Court entered an order substantively consolidating Prestige into the pending case of the Individual Debtors (as defined below).  Change Healthcare was not listed on any schedule of any debtor or added to the creditor matrix.  Instead, Change Healthcare only learned that Prestige was a debtor in bankruptcy when the Trustee recently sued certain of Change Healthcare's affiliates.  Upon learning of the substantive consolidation of Prestige into the Individual Debtors' bankruptcy cases, Change Healthcare advised the Trustee (as defined below) of its claim and sought his consent to the relief requested herein.  The Trustee indicated that he has no objection to the relief sought herein.  Thereafter, on February 26, 2026, Change Healthcare filed Claim No. 39-1 in the amount of the $490,700.00 loaned to Prestige (the "Change POC").  A copy of the Change POC is annexed hereto as **Exhibit 1**.  Because Change Healthcare had no notice to allow it to timely file a proof of claim, this Court should deem the Change POC as timely under Fed. R. Bankr. P. 3002(c)(7).

In support of its motion, Change Healthcare respectfully states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, as well as the *Standing Order of Reference*, entered July 23, 1984 and amended on September 18, 2012 and further amended on June 6, 2025.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by this Court.

2.       Venue is proper pursuant to 28 U.S.C. § 1409.

3.       The statutory predicate for the relief sought herein is Section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3002(c)(7) of the Bankruptcy Rules.

4.       Counsel for Charles M. Forman, as chapter 7 trustee (the "Trustee") has indicated via email that the Trustee does not object to the relief sought in this Motion.

## BACKGROUND[1]

### I.       Change Healthcare's Services and the Cyberattack

5.       Change Healthcare is a healthcare technology company that provides software and technology-related products and services to healthcare providers, government agencies, health insurance companies, and other payors.  Among other things, Change Healthcare operates an electronic claims clearinghouse that provides claims processing services used by healthcare providers and pharmacies for the electronic submission of claims to insurance companies and other payors.

6.       After a claim is submitted by a provider through Change Healthcare's electronic claims clearinghouse to the appropriate payor(s), it is the responsibility and under the control of the payor(s)—not of Change Healthcare—to adjudicate and, if allowed, to pay the claim.  Change Healthcare does not always receive information regarding the remittance or the payment of any claim, or even the status thereof, as that information may be communicated by the payor(s) directly to the provider, and Change Healthcare has no obligation to collect from the payor(s) on behalf of the provider unless specifically contracted for that service.

7.       On February 21, 2024, Change Healthcare discovered that it was the victim of a sophisticated cyberattack (the "Cyberattack").  As part of its response, Change Healthcare made

---

[1] The background for the Change POC and related documents are annexed as part of the Change POC.

the decision to temporarily pause its claim processing services. Change Healthcare's electronic claims clearinghouse began resuming operations commencing in March 2024.

8. While Change Healthcare's claims processing services were temporarily disrupted, providers could have submitted claims via an alternative electronic claims clearinghouse or providers could have manually submitted claims to payors.

9. Change Healthcare's clearinghouse services were fully restored by October 2024, although, in actuality, those and other Change Healthcare services were largely restored several months earlier in June 2024.

## II.    The TFAP

10. To help bridge the gap in short-term cashflow needs for providers impacted by the temporary disruption in Change Healthcare's services, Change Healthcare on behalf of itself, its parents, and affiliates created a Temporary Funding Assistance Program (the "TFAP") whereby interest-free, no-fee loans were provided to providers.

11. The TFAP is administered through the Optum Pay™ ("Optum Pay") claims payment platform operated by Change Healthcare's affiliate, Optum Financial, Inc. Providers who voluntarily elected to participate in the TFAP were required to enroll using their tax identification number through an existing Optum Pay account or by creating a new Optum Pay account. Optum Pay account holders have unique usernames and passwords that they use to access the platform.

12. Within Optum Pay, the TFAP offered two avenues through which providers could receive interest-free, no-fee loans:

    a. First, loan offers were extended to certain providers based on a comparison of the provider's pre- and post-Cyberattack claims payment volumes.

    b. Second, because Change Healthcare only had partial visibility into providers' claims payment volumes, providers were given the opportunity to request loan

4

assistance either (i) in the first instance or (ii) in excess of a pre-determined offer. Such loan assistance was provided in weekly allotments and did not automatically renew. Instead, providers could submit a request every seven (7) days to be considered for additional loan assistance.

13. Once a loan determination was made, Change Healthcare would notify the provider through offers for loans reflected in the respective provider's Optum Pay account. For each week the provider sought loan assistance, the provider was required to log into its Optum Pay account to accept the loan offer. Initially, there was no deadline for providers to accept each loan offer. However, eventually Change Healthcare required providers to accept each loan offer within seven (7) days. To accept a loan offer, the provider was required to agree to be bound by the terms of the standard Temporary Assistance Program Agreement (the "TFAP Agreement") governing, among other things, the terms of repayment. A true and correct copy of the applicable TFAP Agreement is annexed to the Change POC.

14. Each time a provider accepted a loan, it was required to make the following acknowledgements by checking three checkboxes in its Optum Pay account:

- "By selecting this checkbox, I acknowledge that I've reviewed the temporary funding assistance program agreement [(*i.e.*, the TFAP Agreement)] and understand the terms and conditions. I understand that any funding amounts issued to me under this program will need to be repaid in accordance with the program agreement. I understand this funding program to be temporary and that I will need to implement restorative services as directed by Change Healthcare, or its affiliates, to resume standard operations."

5

- "By selecting this checkbox, I acknowledge and represent that I am authorized to sign a legal agreement for the business entity associated with my request and my Optum Pay account.  I further acknowledge and represent that I am authorized to agree to the funding disbursement and repayment term as set forth in the [TFAP] Agreement."

- "I understand and agree that selecting this checkbox is my electronic signature.  I agree my electronic signature is evidence of my intent to being contractually bound by the agreement and shall constitute a valid signature for purposes of any provision of this agreement."

15.     The underlined quoted text above from the first checkbox was offset in blue font and hyperlinked to the TFAP Agreement.  Above the foregoing acknowledgements was a red banner stating: "IMPORTANT:  This is a legal contract to receive funds that will require repayment."  Following the three acknowledgements, the person signing on behalf of the business entity was required to electronically sign their name, provide their email address, and provide their phone number.

### III.    Prestige Infusions LLC's Participation in the TFAP

16.     Change Healthcare did not have a direct contractual relationship with any of the Debtors for electronic claims processing services.  Nevertheless, commencing in April 2024, Prestige utilized its existing Optum Pay account to participate in the TFAP.  Specifically, loan offers were extended to Prestige based on a comparison of Prestige's pre- and post-Cyberattack claims payment volumes and Prestige also submitted 32 separate requests from March 6, 2024 through September 30, 2024 for additional loan assistance under the TFAP in excess of pre-

6

determined offers.[2]  In total, Change Healthcare made 26 offers to Prestige of temporary loan assistance under the TFAP.  Prestige accepted each of Change Healthcare's offers for temporary loan assistance, agreed to be contractually bound by the TFAP Agreement, and electronically signed the three acknowledgements set forth in Paragraph 14 above.

17.    Annexed to the Change POC is a chart detailing each loan amount offered to Prestige, the date and time of the loan offer, the date and time Prestige accepted the loan offer, and the name of the individual who accepted each loan offer on behalf of Prestige, agreed to be contractually bound by the TFAP Agreement, and electronically signed the acknowledgements set forth in Paragraph 14 above.  Prestige received loan assistance in the aggregate amount of $490,700.00 (the "Total Loan Amount") under the TFAP and the TFAP Agreement from April 19, 2024 through September 24, 2024.

18.    Pursuant to the TFAP Agreement, Prestige "agree[d] to pay the [Total Loan] Amount disbursed to [Prestige] in full within forty-five (45) business days of receiving notice that the [Total Loan] Amount is due," and agreed that "[Change Healthcare] will send notice to [Prestige] that the [Total Loan] Amount is due after claims processing and/or payment processing services have resumed and payments impacted during the service disruption period are being processed."  (Change POC, Attachment, Ex. A § 5(a).)

---

[2] Prestige's loan request submissions and the documents that Prestige submitted in support of certain of those requests contain confidential and sensitive commercial information, as well as personally identifiable information.  The Trustee has been provided Prestige's loan request submissions and the documents that Prestige submitted in support of certain of those requests.  Other parties in interest may request a copy of Prestige's loan request submissions and the documents that Prestige submitted in support of certain of those requests by written request to Change Healthcare's counsel and upon the entry into either an acceptable confidentiality agreement or the entry of an appropriate protective order.  If requested by the Court, Change Healthcare will provide a copy of Prestige's loan request submissions and/or copies of the documents Prestige submitted in support of certain of those requests to it for *in camera* review.

19. The TFAP Agreement further provides that in the event Prestige failed to pay the Total Loan Amount when due, "[Prestige] acknowledges and agrees that [Change Healthcare] and/or its parents or subsidiaries may: (i) demand immediate repayment of the [Total Loan] Amount; (ii) offset the [Total Loan] Amount due from any claims or claims payments that are processed or otherwise owed to [Prestige] through [Change Healthcare], Optum Inc., its parent companies, affiliates, or its subsidiaries, and (iii) enforce any other rights and remedies available to it under th[e] [TFAP] Agreement in equity or in law."  (*Id.* § 5(b).)

20. The claims processing services that Change Healthcare offers to providers and the payment processing products that Change Healthcare offers to payors have been fully restored, and, thus, the Total Loan Amount is due for repayment.

21. On or about November 6, 2024, an invoice was sent to Prestige, which summarized the loan assistance that Prestige had received under the TFAP and the total amount due to be repaid (i.e., the Total Loan Amount), and stated that repayment was due by January 10, 2025 (the "TFAP Invoice").  A true and accurate copy of the TFAP Invoice is annexed to the Change POC.

22. Prestige has failed to repay the Total Loan Amount due under the TFAP Agreement. Currently, $490,700.00 is due and owing to Change Healthcare for loan assistance provided to Prestige under the TFAP and the TFAP Agreement.

**IV.    The Debtors' Bankruptcy Case and Change Healthcare's Claim**

23. On December 21, 2023 (the "Petition Date"), Debtors Ayyaz Ahmed and Aysha Khan (together, the "Individual Debtors") filed a joint voluntary petition under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Court"), where it was assigned Case No. 23-21777 (the "Bankruptcy Case").  Change Healthcare was not listed in the Individual Debtors' schedules filed

with the petition and was not served with any notice of the filing of the Bankruptcy Case.  (Dkt. Nos. 1 & 9.)

24.    On January 25, 2024, the Court entered an order converting the Bankruptcy Case to a case under Chapter 11.  (Dkt. No. 38.)  Thereafter, on March 28, 2024, the Court entered an order converting the Bankruptcy Case to a case under Chapter 7.  (Dkt. No. 56.)

25.    On July 24, 2024, the Trustee filed a notice of assets in the Individual Debtors' Bankruptcy Case and set October 22, 2024, as the deadline for creditors to file claims (the "Original Bar Date").  (Dkt. No. 96.)  The notice of assets setting the Original Bar Date was not served on Change Healthcare.  (Dkt. No. 102.)

26.    On December 17, 2024, in the Bankruptcy Case, the Court entered its *Consent Judgment Extending Proceedings and for Related Relief* (the "Extension Order"), which, among other things, extended the Bankruptcy Case to Prestige, Lush Floral & Events LLC, Golden Healthcare LLC d/b/a Golden Healthcare Pharmacy, Oak Hills Medical Building Pharmacy Inc. a/k/a Oak Hills Pharmacy Inc., and Deltona Medical Arts Pharmacy, Inc. d/b/a Apex Health Rx (collectively, the "Business Entities" and together with the Individual Debtors, the "Debtors"), and substantively consolidated the assets and liabilities of the Business Entities with those of the Individual Debtors.  (Dkt. No. 142.)  The Extension Order was not served on Change Healthcare. (Dkt. No. 146.)

27.    Although the Individual Debtors filed amended schedules on September 21, 2025, Change Healthcare was not listed on such schedules.  (*See* Dkt. No. 245.)

28.    In addition, on October 21, 2025, the Trustee moved for authorization to amend the list of creditors, which was granted on November 20, 2025.  (Dkt. Nos. 272 and 284.)  Thus, on December 4, 2025, the Trustee filed a verification of an amended creditor matrix.  (Dkt. No. 288.)

9

Change Healthcare was not listed on the amended creditor matrix. (*See id*.) On December 5, 2025, this Court entered an order providing, *inter alia*, that creditors added to the amended creditor matrix have sixty days to file claims. (Dkt. No. 304.)

29.     On December 4, 2025, the Trustee filed an adversary proceeding against three of Change Healthcare's affiliates, seeking accounting and turnover of property pursuant to 11 U.S.C. §§ 541, 542, and 549 (the "Adversary Proceeding"). (Adv. Pro. No. 25-2504, Dkt. No. 1.) On February 12, 2026, the Trustee filed a notice of voluntary dismissal of the Adversary Proceeding. (Adv. Pro. No. 25-2504, Dkt. No. 9.)

30.     As noted above, Change Healthcare was not provided notice of the pendency of the Bankruptcy Case at its inception and, therefore, did not have an opportunity to file a claim by the Original Bar Date. Nor was Change Healthcare provided notice of the Extension Order, and Change Healthcare was not listed on the amended creditor matrix filed by the Trustee after the entry of the Extension Order. Instead, Change Healthcare only learned of the fact that Prestige was made subject to the Individual Debtors' Bankruptcy Case when its affiliates were sued in the Adversary Proceeding.

31.     As noted above, on February 27, 2026, Change Healthcare filed the Change POC.

### REQUESTED RELIEF

32.     By this Motion, Change Healthcare respectfully requests entry of an order deeming the Change POC as timely filed, pursuant to Bankruptcy Rule 3002(c)(7), on account of the lack of notice Change Healthcare received regarding this Bankruptcy Case.

### BASIS FOR RELIEF

33.     Bankruptcy Rule 3004, which governs proof of claim filings in chapter 7 cases, provides that Bankruptcy Rule 3002(c) applies in chapter 7 cases. Likewise, Bankruptcy Rule 3002(c)(7) provides that:

> On a creditor's motion filed before or after the time to file a proof of claim has expired, the court may extend the time to file by no more than 60 days from the date of its order. The motion may be granted if the court finds that the ***notice was insufficient*** to give the creditor a reasonable time to file.

Fed. R. Bankr. P. 3002(c)(7) (emphasis added).

34.     The previous version of the rule—in which the operative subsection was 3002(c)(6) (which was subsequently changed to (c)(7) with the 2024 amendments)—only applied in cases where "the debtor failed to timely file the list of creditors' names and addresses required by Rule 1007(a)." Fed. R. Bank. P. 3002(c)(6)(A); *see In re Helios & Matheson Analytics, Inc.*, 629 B.R. 772, 779 (Bankr. S.D.N.Y. 2021). However, the rule was amended in 2022 to provide that relief would be granted where notice was insufficient.

35.     The plain text—and comments to—the current version of Rule 3002(c)(7) establish that this Court may deem the Change POC as timely filed, so long as notice was "insufficient under the circumstances to give the creditor a reasonable time to file a proof of claim." Fed. R. Bank. P. 3002, 2022 Committee Note.

36.     "In evaluating whether to extend the deadline to file claims under Rule 3002(c)(7), courts consider whether the creditor had actual notice of the bankruptcy notwithstanding the failure to include or accurately list the creditor on the list of creditors." *In re Maldonado*, No. 25-01357 MAG13, 2025 WL 3070681, at *4 (Bankr. D.P.R. Nov. 3, 2025) (cleaned up); *cf. In re Williams*, 674 B.R. 877, 880 (Bankr. N.D. Ill. 2025) (identifying lack of notice as being the sole reason to extend the bar date in a chapter 13 case, after it had passed).

37.     Here, notice was unquestionably insufficient. Change Healthcare was not listed in the Debtors' original schedules and was not served with the notice of assets setting the Original Bar Date. Thus, Change Healthcare had no opportunity to timely submit a claim by the Original Bar Date (which was prior to the substantive consolidation of Prestige). Moreover, Change

Healthcare was not served with the Extension Order or added to the Debtors' amended creditor matrix after the entry of the Extension Order. Thus, unlike the creditors added to the matrix in December 2025, Change Healthcare did not receive the benefit of the sixty-day period to file any claims against the Debtors.

38.     Change Healthcare, therefore, did not receive actual notice of the Debtors' case with enough time to permit it to timely file the Change POC. Instead, Change Healthcare only learned that Prestige had been made subject to the Individual Debtors' Bankruptcy Cases when its affiliates were sued in the Adversary Proceeding in December 2025. As soon as Change Healthcare was able to ascertain the basis for its claim, it moved quickly to alert the Trustee, seek his consent to the relief sought herein, and file the Change POC so as to ensure that no party was prejudiced.

39.     Counsel for the Trustee has indicated via email that the Trustee does not object to the relief sought in this motion.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Change Healthcare respectfully requests that this Court (a) grant the Motion; (b) deem the Change POC as timely filed; and (c) grant Change Healthcare such further relief as it deems just and proper.

Date: February 27, 2026                                   */s/ Eric Lopez Schnabel*

**DORSEY & WHITNEY LLP**
Eric Lopez Schnabel
Alessandra Glorioso
300 Delaware Avenue, Suite 1010
Wilmington, DE 19801
Telephone:  (302) 425-7171
Email:  schnabel.eric@dorsey.com
        glorioso.alessandra@dorsey.com

-and-

**SHIPMAN & GOODWIN LLP**
Eric S. Goldstein
Jaime A. Welsh
One Constitution Plaza
Hartford, CT 06103-1919
Telephone: (860) 251-5000
Facsimile: (860) 251-5218
Email:  egoldstein@goodwin.com
        jwelsh@goodwin.com

*Counsel for Change Healthcare Operations, LLC*

13